IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 14-158 |
| V. | ) | |
| | ) | (18 U.S.C. §§ 2, 371, 1349, |
| JAVED SUNESRA | | 1956(h); and 21 U.S.C. §§ |
| ZUNED SUNESRA | ) | 331(a), 333(a)(2), 352(o), |
| BISMILLA SUNESRA | ) | 841(a)(1), 841(b)(2), 952(b), |
| TAIMUR KHAN | ) | 960(a)(1), 960(b)(6), and 963) |

**SUPERSEDING INDICTMENT**

The Grand Jury charges:

**The Controlled Substances Act**

1.   At all times relative to the instant Superseding Indictment, the Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States.   21 U.S.C. §§ 801-971.

2.   Various prescription drugs were scheduled substances under the CSA.   There were five schedules of controlled substances - schedules I, II, III, IV, and V.   Drugs were scheduled into these levels based on their potential for abuse, among other things.   Schedule II drugs have a high potential for abuse; their abuse may lead to severe psychological or physical dependence. Schedule III drugs have a moderate to low potential for physical and psychological dependence; their abuse potential is less than Schedule I and Schedule II drugs but more than Schedule IV. Schedule IV drugs have a low potential for abuse;

1

their abuse may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in schedule III. 21 U.S.C. § 812(b)(2)-(4).

3.    Effective January 11, 2012, Carisoprodol (sold and branded as Soma™) is a Schedule IV controlled substance.

### The Federal Food Drug and Cosmetic Act

4.    The United States Food and Drug Administration (FDA) was the agency of the United States responsible for, among other things, enforcing the provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.* The FDCA ensured that drugs sold for human use were safe and effective for their intended uses, and that the labeling of such drugs contained true and accurate information.

5.    The FDA's responsibilities included regulating the manufacturing, labeling, and distribution of prescription drugs shipped or received in interstate commerce. The responsibilities of the FDA included inspecting facilities where drug products were manufactured, labeled, and packaged; examining the records at such facilities to determine whether the drugs were packaged and labeled under conditions whereby their quality could be assured; and, where appropriate, preventing products that were unapproved for marketing, or were improperly packaged and labeled, from reaching the marketplace.

6.    Under the FDCA, the term "drug" included articles

2

which were (1) recognized in the official United States Pharmacopeia or official National Formulary or any supplement to any of them; (2) intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man; or (3) intended to affect the structure or any function of the body of man.  21 U.S.C. §§ 321(g)(1)(A), (B), and (C).

7.   Some of the drugs regulated under the FDCA were "prescription drugs." "Prescription drugs" were those drugs which, because of their toxicity or other potential harmful effects, or the method of their use, or the collateral measures necessary to their use, were not safe for use except under the supervision of a practitioner licensed by law to administer such drugs, or which were required to be administered under the professional supervision of a practitioner licensed by law to administer such drugs as a condition of FDA approving any such drug to be distributed in interstate commerce.  21 U.S.C. §§ 353(b)(1)(A) and (B).

8.   The term "counterfeit drug" included drugs which, or the container or labeling of which, without authorization, bore the trademark, trade name, or other identifying mark, or any likeness thereof, of a drug manufacturer other than the manufacturer who in fact manufactured such drugs.

9.   The term "generic drug" means a drug that is the same as a brand name drug in dosage, safety, strength, how it is

3

taken, quality, performance and intended use. Before approving a generic product, the FDA requires many rigorous tests and procedures to assure that the generic drug can be substituted for the brand name drug. By law, a generic drug product must contain the identical amounts of the same active ingredients as the brand name product.

10. Only generic drugs that have submitted an application to and have received an approval by the FDA may be distributed in the United States.

11. Under the FDCA, the term "label" meant a display of written, printed or graphic matter upon the immediate container of any article. The term "labeling" is broader and was defined as all labels and other written, printed, or graphic matter upon any article or any of its containers or wrappers, or accompanying such article.

12. Certain Schedule IV controlled substances were available only by prescription. 21 U.S.C. § 829(c). These drugs include, but are not limited to:

a. Soma™ was a Schedule IV prescription drug, which contains the active ingredient Carisoprodol, and which is indicated for the relief of discomfort associated with acute, painful musculoskeletal conditions in adults. Meda Pharmaceuticals manufactured brand name Soma™, and the FDA has approved through abbreviated new drug applications approximately

19 generic versions of a drug containing Carisoprodol for distribution in the United States.

13. A number of non-controlled substances, including but not limited to the drugs identified as follows, were prescription drugs within the meaning of 21 U.S.C. §§ 353(b)(1)(A) and (B):

a. Celebrex™ was a prescription drug approved by the FDA to treat medical conditions such as osteoarthritis. GD Searle manufactured brand name Celebrex™ and its active ingredient Celecoxib. The FDA had not approved a generic drug containing Celecoxib for distribution in the United States.

b. Advair Diskus™ was a prescription drug approved by the FDA to treat asthma. Glaxo Smith Klein manufactured brand name Advair Diskus™ and its active ingredients Fluticasone Propionate and Salmeterol Xinafoate. The FDA had not approved a generic drug containing Fluticasone Propionate and Salmeterol Xinafoate for distribution in the United States.

c. Viagra™ was a prescription drug approved by the FDA to treat erectile dysfunction. Pfizer manufactured Viagra™ and its active ingredient Sildenafil Citrate. The FDA had not approved a generic drug containing Sildenafil Citrate for distribution in the United States.

d. Geodon™ was a prescription drug approved by the FDA to treat dementia. Pfizer manufactured Geodon™ and its active

ingredient Ziprasidone Hydrochloride.  The FDA has approved six different abbreviated new drug applications for generic drugs containing Ziprasidone Hydrochloride for distribution in the United States.

e.  Cymbalta™ was a prescription drug approved by the FDA to treat depression.  Eli Lilly & Company manufactured brand name Cymbalta™ and its active ingredient Duloxetine Hydrochloride.  The FDA has approved abbreviated new drug applications for nine generic drugs containing Duloxetine Hydrochloride for distribution in the United States.

f.  Cialis™ was a prescription drug approved by the FDA to treat erectile dysfunction.  Eli Lilly & Company manufactured brand name Cialis™ and its active ingredient, Tadalifil.  The FDA had not approved a generic drug containing Tadalafil for distribution in the United States.

g.  Symmetrel™ was a prescription drug approved by the FDA to treat influenza.  Endo Pharmaceuticals manufactured brand name Symmetrel™ and its active ingredient, Amantadine Hydrochloride.  The FDA had not approved a generic drug containing Amantadine Hydrochloride for marketing in the United States.

h.  Lexapro™ was a prescription drug approved by the FDA to treat depression.  Forest Labs manufactured brand name Lexapro™ and its active ingredient, Escitalopram Oxalate.  The

FDA has approved approximately twelve abbreviated new drug applications for generic drugs containing Escitalopram Oxalate for distribution in the United States.

i. Xenical™ was a prescription drug approved by the FDA to treat obesity. Hoffman La Roche manufactured brand name Xenical™ and its active ingredient, Orlistat. The FDA had not approved a generic drug containing Orlistat for distribution in the United States.

j. Accutane™ was a prescription drug approved by the FDA to treat acne. Marketing of this drug has been discontinued. Hoffman La Roche manufactured brand name Accutane™ and its active ingredient, Isotretinoin. The FDA had not approved a generic drug containing Isotretinoin for distribution in the United States.

k. Trexall™ was a prescription drug approved by the FDA to treat neoplastic diseases. Barr manufactured brand name Trexall™ and its active ingredient, Methotrexate Sodium. The FDA had not approved a generic drug containing Methotrexate Sodium for distribution in the United States.

l. Xeloda™ was a prescription drug approved by the FDA to treat cancer. Hoffman La Roche manufactured brand name Xeloda™ and its active ingredient Capecitabine. The FDA has approved one abbreviated new drug application for a generic drug containing Capecitabine for distribution in the United States.

7

m.   Zoloft™ was a prescription drug approved by the FDA to treat depression.   Pfizer manufactured brand name Zoloft™ and its active ingredient, Sertraline Hydrochloride.   The FDA had not approved a generic drug containing Sertraline Hydrochloride for distribution in the United States.

n.   Elavil™ was a prescription drug approved by the FDA to treat depression.   Astra-Zeneca manufactured brand name Elavil™ and its active ingredient, Amitriptyline Hydrochloride.   The FDA had not approved a generic drug containing Amitriptyline Hydrochloride for distribution in the United States.

o.   Sustiva™ was a prescription drug approved by the FDA to treat HIV.   Bristol Myers Squibb manufactured brand name Sustiva™ and its active ingredient, Efavirenz.   The FDA had not approved a generic drug containing Efavirenz for distribution in the United States.

p.   Abilify™ was a prescription drug approved by the FDA to treat schizophrenia.   Otsuka manufactured brand name Abilify™ and its active ingredient, Aripiprazole.   The FDA had not approved a generic drug containing Aripiprazole for distribution in the United States.

q.   Zofran™ was a prescription drug approved by the FDA to treat breast cancer.   GlaxoSmith Kline manufactured brand name Zofran™ and its active ingredient Ondansetron Hydrochloride. The FDA has approved approximately eleven abbreviated new drug

applications for generic drugs containing Ondansetron Hydrochloride for distribution in the United States.

r. Zyprexa™ was a prescription drug approved by the FDA to treat schizophrenia. Eli Lilly manufactured brand name Zyprexa™ and its active ingredient, Olanzapine. The FDA has approved eight abbreviated new drug applications for generic drugs containing Olanzapine for distribution in the United States.

14. The FDCA prohibited the introduction or delivery for introduction into interstate commerce of any drug that was misbranded. 21 U.S.C. § 331(a).

15. A drug was deemed to be misbranded unless its labeling contained adequate directions for use, which was defined by regulation as directions under which a layman can use a drug safely and for the purposes for which it was intended. 21 U.S.C. § 352(f); 21 C.F.R. § 201.5.

16. Prescription drugs were exempt from the requirement that the labeling contain adequate directions for use provided that they satisfied a number of conditions, including that they had been dispensed under the supervision of a properly licensed medical practitioner, and they bore the FDA-approved labeling. 21 U.S.C. § 353(b)(2); 21 C.F.R. § 201.100 (c).

17. There can be no adequate directions for lay use of a prescription drug; therefore, prescription drugs that are not

dispensed under the supervision of a properly licensed medical practitioner were misbranded within the meaning of 21 U.S.C. § 352(f).  *See, e.g.*, 21 U.S.C. § 353(b); 21 C.F.R. §§ 201.5, 201.100.

18.  The act of dispensing prescription drugs without the prescription of a practitioner licensed by law to administer such drug was an act which caused the drug to become misbranded while held for sale. 21 U.S.C. § 353(b)(1).

19.  A drug is also deemed misbranded if it is a drug and it is offered for sale under the name of another drug.   21 U.S.C. § 352(i)(3).

**General Allegations**

A. Overview

20.  Beginning in at least November, 2005, the exact date being unknown, and continuing until at least in and around April, 2014, in the Western District of Pennsylvania and elsewhere, both within and without the customs territory of the United States, **JAVEED SUNESRA, ZUNED SUNESRA, BISMILLA SUNESRA, and TAIMUR KHAN** (collectively, "Defendants"), and others known and unknown to the grand jury, did knowingly and intentionally combine, conspire, confederate and agree with others both known and unknown, to import into the customs territory of the United States from India both Schedule IV controlled substances and non-controlled prescription drugs.   The prescription drugs

imported into the United States by Defendants had not been FDA approved; instead, these drugs had been manufactured for the Indian market and contained the same active ingredients as FDA-approved brand name drugs.

21. It was a goal of the conspiracy to obtain money and other things of value by unlawfully distributing controlled and non-controlled drugs to customers in the United States and other countries. Bank records, payment processor records and submitted applications show that emedoutlet.com and its affiliate websites sold millions of dollars' worth of prescription drugs over the course of its existence.

22. As part of this conspiracy, Defendants, together with other co-conspirators, known and unknown, owned, operated, and conducted a business known as "emedoutlet.com." Emedoutlet.com, which, in turn, was owned by the parent company Asian Capital Equities ("ACE"), operated a number of different websites, including, but not limited to: www.shopeastwest.com, livemedsupport.com, www.emedoutlet.com, www.tristatedrugs.com, www.tristatemeds.com, www.superdrugsaver.com, www.calidrugs.com, www.westcoastdrugs.com, www.iwantmeds.com, www.pharmacyave.com, medhubonline.com, www.easterndrugs.com, www.nobledrugstore.com, and www.lapeches.com.

23. These internet websites were pharmacy portals that shipped prescription drugs from India to customers located in

the United States, amongst other countries.  These websites claimed to offer prescription drugs that had been approved by the FDA, but in actuality, these drugs were unauthorized copies of FDA-approved branded drugs manufactured by unregistered factories located in India.[1]  Although emedoutlet.com and its affiliates sold drugs that required a doctor's prescription in the United States, no prescription or physician examination was actually required to complete the transaction and purchase the prescription drugs.

24. Emedoutlet.com and its affiliates have also fraudulently misrepresented to customers what they were actually selling, and fraudulently misrepresented the manner in which they were conducting business.  For example, on its website, emedoutlet.com claimed to "have hundreds of thousands of customers"; to have "one of the largest supplies of the most varied ranges of generic medications and brand name medications accessible over the internet" and to ship "FDA approved generic drugs."  The website claimed that "the generic drugs producing facilities are designed and maintained as per FDA and WHO specifications … [s]o they are completely safe and quality of drugs is strictly observed."  Further, Emedoulet.com stated that

---

[1] Notably, the FDA does license factories in India to produce prescription drugs for importation into the United States (hence, "registered factory"), however here, none of the drugs received during controlled purchases of medication by investigators had been produced in a registered factory.

it carried the "same compatible brand name in generic strength prescription products you would find in your neighborhood pharmacy." The company provided a number of manufacturers from which it purportedly purchased drugs, including Pfizer, Sanofi, Aventis, and Merck. The website also stated that it required a prescription in order to ship prescription drugs to customers.

25. Likewise, shopeastwest.com set forth on its website that it is an "online pharmacy providing generic FDA-approved alternatives to branded medications." This website further advised that it sold generic versions of "Sildenafil citrate" and "Viagra." Further confirming that emedoutlet.com was informing customers that it was shipping FDA-approved medications, in a January 5, 2009, email response to a customer whose medication had been seized by United States Customs, superdrugsaver.com wrote "[w]e sell only FDA-approved medicines from India and guarantee the quality and chemical equivalence to the US counterpart."

26. In fact, many of these, and other, statements set forth on emedoutlet.com and its affiliates were not true. The company, and its affiliates, did not ship FDA-approved generic drugs that were produced in FDA-approved factories, these drugs were not comparable to what was sold in United States pharmacies, and these drugs were not purchased from companies such as Pfizer, Sanofi, Aventis or Merck. Further, no generic

versions of Sildenafil citrate or Viagra had been approved by the FDA. In addition, multiple purchases of medication were made from emedoutlet.com and its affiliates by federal investigators, and none required a prescription. Instead, emedoutlet.com shipped unapproved generic versions of branded drugs that had been manufactured in India. It is unlawful to import these unapproved drugs into the United States. 21 U.S.C. § Section 331(aa).

27. Defendants, who ran emedoutlet.com and its affiliates, were well-aware that their business of shipping prescription drugs from India to the United States was unlawful. For example, in a December 17, 2010 email from Javed Sunesra to Bismilla Sunesra, a document entitled "list of meds to hide" was attached to the email. This document included a number of drugs that were prohibited for sale, one of which was the obesity drug Xenical. In a second email dated April 4, 2011, from norxresponse@gene.com, Sunesra was again warned that it was unlawful to dispense Xenical in the United States. As detailed below, in 2013, undercover agents conducted a controlled purchase of Xenical from emedoutlet.com.

28. Defendants were further aware that it was unlawful to ship prescription drugs to the United States without a prescription. As an example, in a February 15, 2012, email from Javed Sunesra to an account at shopeastwest2@hotmail.com,

14

Sunesra responded to an email about whether it was appropriate to continue to supply drugs without a prescription. Sunesra, in response, wrote "Right now if they are old customers we will supply as is … it is for all new users we have to be careful of … it is better to avoid the question and if they don't ask then we won't require it."

29. Finally, Defendants were aware that many of the prescription drugs sold by them had potentially dangerous side effects.

a. As an example, emedoutlet.com sold unapproved generic versions of Propecia, a common prescription drug taken to prevent hair loss. As part of their marketing, emedoutlet.com listed potential side effects for taking the medication. In a December 13, 2010, email to the person who drafted the marketing description for publication on the emedoutlet.com websites, Bismilla Sunesra wrote, "[y]ou are giving too many side effects. Please remember we are trying to sell the medication and not discourage people from buying it."

b. As another example, emedoutlet.com provided "customer support" through a chat interface. On November 5, 2013, "VICTIM 1" sent a "chat" to an emedoutlet.com customer-service representative complaining of the quality of the medication sold by "superdrugsaver.com," which is an affiliate website owned and operated by emedoutlet.com. The chat, which was sent to Javed

Sunesra, who forwarded it to another co-conspirator, stated as follows:

> VICTIM 1: Dear Sir, Hi, I ordered 100mg sertraline tablets from an online pharmacy called "superdrugsaver.com". I have taken 200mg of sertraline/zoloft a day, for the past 12 years. The pills that I received from them have made me so sick and depressed, I cannot even express to you in words how bad these pills have made me feel. I never remotely experienced these types of side effects from any sertraline that I have taken. Again, I have been taking sertraline for a long time. This anguish spawned me to find out who manufactured these pills, so I would be sure never to subject myself to this kind of pain again. Unfortunately, the back of the pill container tells me it was manufactured by: "Swiss-Garnier Life Sciences". Hence, you are receiving an email expressing a deep complaint as well as extreme dissatisfaction from me. I should of known better then to trust a pill that has no alpha-numeric imprint on it. I plan on emailing your factory, as well as superdrugsaver.com expressing to them what these tablets have done to me. Sincerely, [VICTIM 1]
>
> EMEDOUTLET: OK. Will forward you mail [sic] to the concerned persona and send you a reply.
>
> VICTIM 1: What? You need to let your boss know about this. These drugs you have sent me are just insane. Do you understand? What kind of s**t are you sending to people?
>
> EMEDOUTLET: Yes. Will forward your msg. We will send you a reply separately by email.
>
> VICTIM 1: You are trusting this company that does not even put an [sic] standard imprint on the pills you are sending, and then I am trusting you.

c.   As a final example, Ultram is a prescription opiod

pain reliever that has serious side effects.[2] Specifically, doctors are warned not to prescribe Ultram to patients who are suicidal or addiction-prone. On August 15, 2013, VICTIM 2 committed suicide at her workplace in central Illinois by leaping from the fourth floor into the atrium down below. Prior to her death, VICTIM 2 had been ordering from superdrugsaver.com, an emedoutlet.com website, 90 pills of Ultram 50mg three times each month without the prescription of a doctor. On August 28, 2013, Shirin Bharucha, who worked for Javed Sunesra as part of the emedoutlet.com business, using the email address shopeastwest2@hotmail.com, sent an email to Javed Sunesra, stating, in reference to VICTIM 2, "just though i wd tell you about this poor thing!! She was a very regular customer." Attached to the email was a message from a relative of VICTIM 2 to emedoutlet.com. This message read: "You f**king people killed my daughter [VICTIM 2] by sending her pain meds. Without a prescription. Your company needs to be shut down. My daughter committed suicide. Think about what u r doing to young people when just care about the money u take!!!". To this message from Bharucha, Javed Sunesra responded, "I think we should ignore for now."

B. Payment for drugs

---

[2] Effective August 18, 2014, Ultram has been classified by the Drug Enforcement Administration as a Schedule IV controlled substance.

30. Since its inception, emedoutlet.com has used a number of different payment processors to accept credit card payments for customers.   Generally, emedoutlet.com had little problem securing the services of a payment processor for its illegal business.

31. However, in recent years, Visa, together with other credit card payment processors, made it difficult for online overseas pharmacies to accept credit cards as a method of payment for prescription drugs.   This is because online pharmacies such as emedoutlet.com are engaging in an unlawful business, and the major credit card processors have declined to provide payment processor services for these types of pharmacies.   These credit card processors have therefore prohibited their customers from using credit cards to make purchases at emedoutlet.com and its affiliates.   Given that most consumers want to use credit cards to complete purchases on the internet, this has presented a major problem for emedoutlet.com and its affiliates.

32. To circumvent this payment issue, the emedoutlet.com network began to disguise the prescription drug purchases by making them appear to be "gift card" purchases.   In essence, customers used their credit card to purchase a "gift card," which they then were immediately required to redeem to purchase the desired medications from the online pharmacies.

33. Once a customer selected the drugs they wished to purchase, and attempted to complete the sale using a credit card as payment, they were then redirected to the website **www.mygiftcard.biz**, where they were required to purchase a gift card that was worth the exact same amount as the drug order. No customer ever received a gift card, however, as the gift card would immediately be "redeemed" to pay for the medications.

34. Mygiftcard.biz was a company registered in British Columbia, Canada, under the name of Taimur Khan. To process payments for mygiftcard.biz, Khan used two primary payment processors: Elavon and Paypal. For both of these companies, Khan misled as to what emedoutlet.com was actually selling. In the application to Elavon, a business that offers payment processing solutions, for payment processing, Khan claimed that mygiftcard.biz sold "prepaid retail gift cards" with a monthly sales volume of $30,000. Additionally, in a February 1, 2013, call, Taimur Khan advised that emedoutlet.com was selling only gift cards even though Elavon advised Khan of a dispute in which a customer had claimed to purchase "vitamins."

35. Likewise, in a letter to PayPal that was uploaded via the Internet into their system on August 20, 2012, Khan, in describing the business of mygiftcard.biz, wrote:

> Mygiftcard.biz sells discount gift cards to consumers who would like to save money at their favorite retailers. Our business model is similar to

19

> www.plasticjungle.com, www.cardpool.com, and others.
> We are not a financial services or money services
> provider.   We work with Internet marketing (SEO)
> companies who have contracts to promote various
> retailers (ie JC Penney, Old Navy etc.)   These
> companies use gift cards as one internet marketing
> method to promote their online and retail presence.
> As an internet marketer, I am able to purchase these
> gift cards at a discount and list them on my site and
> do my promotion.

36.   Khan concluded the letter by stating that he "hope[s] this clears any misunderstandings about my business."

37.   These fraudulent statements to the payment processors, together with the use of website mygiftcard.biz, were made to disguise to the credit card payment processors the true purpose of the payment, as the dual-nature of the transaction made it appear that the consumer was purchasing a "gift card," while in actuality, the consumer was purchasing prescription drugs from an online pharmacy.   These drugs were then unlawfully exported from India into the United States.

38.   That mygiftcard.biz was created solely to provide a means of credit card payment for emedoutlet.com is demonstrated by the fact that an undercover agent with the FDA attempted on at least three separate occasions in 2013 to purchase a "gift card" from mygiftcard.biz without also buying drugs from emedoutlet.com and its affiliate website.   Each time, the undercover agent was unsuccessful, and each time, the agent's computer was infected with a computer virus.   Further, in

creating the gift card payment option, Taimur Khan wrote in a November 12, 2012, email to Javed Sunesra that putting credit card logos on the "homepages" seemed "really risky," and that he wanted to move these logos in order "to keep the heat as low as possible."

39.   From October, 2012, to March, 2013, Elavon processed approximately $265,000 in credit card transactions for mygiftcard.biz.   As detailed below, some of these monies came from purchases by customers residing in the Western District of Pennsylvania.   These funds were sent to Khan in Canada, who then, after taking his "commission," wired the remaining funds to an account in the Republic of Mauritius.   From April 2012 to June 2013, Paypal processed approximately $313,000 in credit card transactions for mygiftcard.biz.   Again, these funds were sent to Khan in Canada, who then, after taking his "commission," wired the remaining funds to an account in Mauritius.

C. Emedoutlet.com generated millions of dollars in cash proceeds.

40.   The size of the emedoutlet.com network of pharmacies was significant.   ACE set forth in documents that the abovementioned pharmacy websites were bringing in monthly gross sales totaling $400,000, that the company had over 30 employees, and that the company had more than 40,000 customers worldwide.

41.   As noted above, in a five-month period, Elavon alone

processed approximately $265,000 in payments. In a year-long overlapping period with Elavon, Paypal processed approximately $313,000 in payments. Elavon and Paypal processed payments only for two pharmacy websites each, thus leaving multiple other pharmacy websites that were processed using different means. As a result, the payments processed by Elavon and Paypal represent only a fraction of the total proceeds received by emedoutlet.com over the relevant time period.

42. Emedoutlet.com also submitted a number of applications to payment processors (companies who process customers' credit cards) that indicated that the websites operated by Defendants were selling large quantities of prescription drugs each year.

a. In payment processing applications to Elavon, emedoutlet.com claimed that the mygiftcard.biz website alone had monthly sales of $30,000.

b. In another application for payment processing for emedoutlet.com, dated November 15, 2012, emedoutlet.com set forth that it processed 500 transactions each month with a total dollar sales amount of $50,000 each month.

c. In a third payment processing application, dated November 15, 2012, emedoutlet.com stated that its latest month's sales volume consisted of 559 transactions totaling $70,710.25. Six months earlier, in May, 2012, the company claimed $62,392.37 in sales volume for 477 transactions over the course of that

month.

d. A fourth payment processing application, from November of 2010, also showed $50,000 in monthly sales, and the company claimed that 70% of its business was with customers located in the United States.

43. Much of these monetary proceeds were sent back to emedoutlet.com accounts located at the State Bank of Mauritius. For example, on October 1, 2012, and October 22, 2012, wire transfers in the amounts of $72,883.03 and $30,000, respectively, were sent from bank accounts in the United States to ACE, with the charged beneficiary on the wire transfers being defendant Zuned Sunesra.

D. Charged Defendants and Entities

44. The following defendants and entities play the following roles within the emedoutlet.com organization.

a. **Javed Sunesra**: Javed Sunesra is an Indian national who is generally in charge of the emedoutlet.com network of pharmacies, with many of the websites registered in his name. The website "emedoutlet.com" was registered to Javed Sunesra. Javed Sunesra has lived in the United States at points in his life, most recently in Lodi, California, and Live Oak, Florida.

b. **Zuned Sunesra**: Zuned Sunesra is the brother of Javed Sunesra. Zuned Sunesra largely assists Javed Sunesra in the operation of the emedoutlet.com network, and he also provides

23

and facilitates the banking relationships of emedoutlet.com, which helps the companies stay in business. Zuned Sunesra is listed as a director of Asian Capital Equities.

c. **Bismilla Sunesra**: Bismilla Sunesra provided logistical and business support to the emedoutlet.com network of pharmacies. In that regard, Bismillah Sunesra primarily instructed emedoutlet.com employees on drug marketing, but she also helped emedoutlet.com obtain payment processing for its websites.

d. **Taimur Khan**: Khan ran the mygiftcard.biz portion of the emedoutlet.com network. This function was critical to the business success of emedoutlet.com, as the purchase of "gift cards" allowed overseas customers to use credit cards to purchase medications from emedoutlet.com.

e. **Asian Capital Equities** ("ACE"): ACE is the parent company of the emedoutlet.com network of pharmacies, and it has a listed address of 206A Sai Darshan Bldg., Opp. Mulji Nagar Sa Road in Borivil, WBNG 4000092, India. The company was registered in Mauritius in December of 2003. Monthly sales for the online pharmacies associated with ACE are approximately $400,000.

f. **SKI USA** is a business registered in the State of Florida to Javed Sunesra. This business is used by Sunesra facilitate the unlawful sale of pharmaceuticals in the United

24

States.

E. Customers

45. On or about November 21, 2012, and in and around August, 2012, CUSTOMER 1, a resident of Anita, Pennsylvania, which is located in the Western District of Pennsylvania, purchased generic Nexium from www.shopeastwest.com. These medications were shipped to CUSTOMER 1 from India, and CUSTOMER 1 did not provide a prescription prior to receiving the medication. CUSTOMER 1 was aware that no generic version of Nexium had been approved for use in the United States. CUSTOMER 1 purchased a $60.00 gift card from mygiftcard.biz to pay for the medication purchased in November, 2012.

46. In and around March, 2013, CUSTOMER 2, a resident of Pittsburgh, Pennsylvania, which is located in the Western District of Pennsylvania, purchased antibiotics from shopeastwest.com in March, 2013, and these medicines were delivered to him/her in Pittsburgh from India. CUSTOMER 2 did not provide a prescription prior to receiving the medication, and CUSTOMER 2 believed, from a review of the website, that these drugs were FDA-approved.

47. On or about April 6, 2013, CUSTOMER 3, a resident of Rankin, Pennsylvania, which is located in the Western District of Pennsylvania, purchased the prescription antibiotic Erythromycin from westcoastdrugs.net for $20.99, which he/she

paid for with a gift card that was instantly redeemed for the drug purchase. No prescription was required to purchase the medication. The drug arrived in a package from Mumbai, India, and CUSTOMER 3 noted that the drug did not match the photographs posted on the website. Accordingly, CUSTOMER 3 could not verify if the drug was actually Erythromycin. CUSTOMER 3 would not have purchased the drug if it had not been FDA approved.

48. On or about February 14, 2013, CUSTOMER 4, a resident of Verona, Pennsylvania, which is located in the Western District of Pennsylvania, purchased the prescription drug Ivermectin from westcoastdrugs.net for $44.99. CUSTOMER 4 purchased this medication with a gift card that he/she was required to purchase. No prescription was required prior to receiving the drug. Upon receipt of this drug from India, CUSTOMER 4 flushed the drug down the toilet.

49. On or about May 9, 2013, CUSTOMER 5, a resident of Greensburg, Pennsylvania, which is located in the Western District of Pennsylvania, purchased a $205 gift card from mygiftcard.biz. CUSTOMER 5 immediately redeemed this gift card for 360 pills of the prescription drug Tricor. CUSTOMER 5 was not required to provide a prescription for this order. The drugs were shipped to CUSTOMER 5 from India.

50. On or about February 25, 2013, CUSTOMER 6, a resident of Cranberry Township, Pennsylvania, which is in the Western

District of Pennsylvania, paid $188.98 to mygiftcard.biz, which was immediately redeemed to purchase unapproved generic Viagra from shopeastwest.com. CUSTOMER 6 was not required to produce a prescription prior to ordering or receiving this prescription drug. These drugs were shipped to CUSTOMER 6 from India. CUSTOMER 6 would not have ordered these drugs had he/she known that they were not FDA approved. CUSTOMER 6 provided the FDA with one remaining pill of "Vigora," which matched the medicine purchased by undercover agents, as detailed below.

F. Controlled Purchases of Medication

51. Law enforcement completed a number of controlled purchases of prescription drugs from Defendants. The following represents a sampling of the controlled purchases of drugs from Defendants.

52. On or about August 31, 2012, the Defendants agreed to sell Celebrex™ and Soma™, which are prescription drugs, to an undercover agent of the Food and Drug Administration. This purchase was made from the website www.superdrugsaver.com, which is operated by the Defendants. The purchase price totaled $72.97, and this purchase was completed over the Internet.

53. No prescription or medical necessity was required to purchase these medications.

54. Between on or about August 31, 2012, and on or about September 5, 2012, the undercover agent made a payment of $72.97

by bank transfer from an account located in the United States (PNC Bank) to an account located in India (South Malabar Gramin Bank).

55.  On or about September 6, 2012, Defendants caused to be sent by mail from India to the Western District of Pennsylvania, two packages of drugs which were received.  The first package contained Celecoxib, the active ingredient in Celebrex™, and the second package contained Carisoprodol, which is the active ingredient in Soma™ as well as the established name for generic Soma.  The labeling on these drugs represented that they were unapproved medications that had been manufactured in India.

56.  None of these drugs had been approved by the FDA, were approved generics, or were imported into the United States by an approved importer or manufacturer.  Further, none of these drugs contained adequate directions for use as is defined by statute and regulation.

57.  On or about September 24, 2012, the Defendants agreed to sell Geodon, Sildenafil Citrate, and an Advair Diskus-1 Accuhaler, all of which require a prescription, to an undercover agent of the Food and Drug Administration.  This purchase was made from the website www.shopeastwest.com, which is operated by the Defendants.  The purchase price totaled $259.97, and this purchase was completed over the Internet.

58.  No prescription or medical necessity was required to

purchase these medications.

59.  On or about September 24, 2012, the Defendants sent an e-mail to the undercover agent directing that payment for the drugs ordered be made by wire transfer to a Western Union account, which the undercover agent did by providing, on or about September 27, 2012, to a wire remitter known as Western Union.  On or about September 27, 2012, the undercover agent received an email stating, "Thank you, your payment has been sent to ShopEastWest."

60.  On or about September 29, 2012, Defendants caused to be sent by mail from India to the Western District of Pennsylvania, two packages of drugs which were received.

61.  The first package contained Salmeterol Fluticasone Propionate Accuhaler Seretide Accuhaler 50mcg/500mcg (active ingredients in Advair Diskus), which was manufactured in the United Kingdom, and Vigora 100, Sildenafil Citrate (Sildenafil Citrate is the active ingredient in Viagra), which was manufactured in India.  The second package contained Ziprasidone Hydrochloride Capsules (active ingredient in Geodonn), which was manufactured in India.

62.  None of these drugs had been approved by the FDA, were approved generics, or were imported into the United States by an approved importer or manufacturer.  Further, none of these drugs contained adequate directions for use.

63. On or about November 27, 2012, the Defendants agreed to sell Cymbalta and Tadalafil to an undercover agent of the Food and Drug Administration. This purchase was made from the website www.shopeastwest.com, which is operated by the Defendants. The purchase price totaled $172.98, and this purchase was completed over the Internet.

64. No prescription or medical necessity was required to purchase these medications.

65. The transaction was completed as follows. After the undercover agent added the prescription drugs to his shopping cart and proceeded to the checkout, the agent elected to pay with a gift card. This payment selection stated, "No waiting! Instantly pay for your Giftcard with Visa, Mastercard or Discover," and "instantly redeem your Giftcard towards your Shopeastwest medicine order!" After placing the order, the undercover agent was redirected to the website "mygiftcard.biz," where the agent used his credit card to purchase a gift card for $172.98, which was immediately redeemed to pay for the purchased drugs. An email receipt was provided which stated that a giftcard for $172.98 had been purchased and used to pay for the shopeastwest.com order that had been placed.

66. On or about November 30, 2012, Defendants caused to be sent by mail from India to the Western District of Pennsylvania, two packages of drugs which were received. The first package

contained Tadalafil (active ingredient in Cialis), which had been manufactured in India. The second package contained Duloxetine (active ingredient in Cymbalta), which had been manufactured in India.

67. None of these drugs had been approved by the FDA, were approved generics, or were imported into the United States by an approved importer or manufacturer. Further, none of these drugs contained adequate directions for use.

68. On or about January 14, 2013, the Defendants agreed to sell generic Soma (Carisoprodol), Symmetrel, and Lexapro (all of which require a prescription to be dispensed) to an undercover agent of the Food and Drug Administration. This purchase was made from the website www.westcoastdrugs.com, which is operated by the Defendants. The purchase price totaled $141.97, and this purchase was completed over the Internet.

69. No prescription or medical necessity was required by defendants to purchase these drugs.

70. The transaction was completed as follows. As detailed above, these drugs were purchased with a gift card from mygiftcard.biz in the amount of $141.97. This gift card was purchased with a credit card online, and was immediately redeemed to pay for the prescription drug order.

71. On or about January 30, 2013, Defendants caused to be sent by mail from India to the Western District of Pennsylvania,

31

two packages of drugs which were received.   The first package contained Carisoprodol, which had been manufactured in India. The second package contained Amantadine Hydrochloride (active ingredient in Symmetrel) and Escitalopram Oxalate (active ingredient in Lexapro), which had been manufactured in India.

72.   None of these drugs had been approved by the FDA, were approved generics, or were imported into the United States by an approved importer or manufacturer.   Further, none of these drugs contained adequate directions for use.

73.   On or about April 1, 2013, the Defendants agreed to sell Xenical, Accutane (marketing of Accutane has been discontinued), and Soma, all of which require a prescription to be dispensed, to an undercover agent of the Food and Drug Administration.   This purchase was made from the website www.superdrugsaver.com, which is operated by the Defendants. The purchase price totaled $249.17, and this purchase was completed over the Internet.

74.   No prescription or medical necessity was required by defendants to purchase these drugs.

75.   The transaction was completed as follows.   The undercover agent paid for the drugs using a Visa card for the amount of $249.17.   After paying for the drugs, the agent received an email stating that the transaction would appear on

32

the billing statement as "Walnu-cabinets PLC."[3]

76.   On or about April 3, 2013, Defendants caused to be sent by mail from India to the Western District of Pennsylvania, two packages of drugs which were received.   The first package contained Carisoprodol (active ingredient in Soma), which had been manufactured in India.   The second package was Tretiva-40, which contained Isotretinoin (active ingredient in Accutane) and Orlistat 120 (active ingredient in Xenical), all of which had been manufactured in India.

77.   None of these drugs had been approved by the FDA, were approved generics, or were imported into the United States by an approved importer or manufacturer.   Further, none of these drugs contained adequate directions for use.

78.   On or about April 30, 2013, the Defendants agreed to sell Methotrexate, Capecitabine, and Tadalafil (all of which require a prescription to be dispensed) to an undercover agent of the Food and Drug Administration.   This purchase was made from the website www.shopeastwest.com, which is operated by the Defendants.   The purchase price totaled $324.97, and this purchase was completed over the Internet.

---

[3] Emedoutlet.com was selling pharmaceuticals, and the fact that they billed themselves as "Wal Nu Cabinets" was yet another attempt to evade the restrictions of the credit card companies from using credit cards to illegally purchase medications from India.

79.  No prescription or medical necessity was required by the defendants to purchase these drugs.  Further, methotrexate is an oncology drug that comes with "black box" warnings, used to highlight the fact that the use of a drug could result in side effects that posed a risk of serious injury or death.

80.  The transaction was completed using the "mygiftcard.biz" website and gift card system described above, which involved the use of an undercover credit card.  Again, the "gift card" purchased by the undercover agent was redeemed immediately to pay for the purchased medications.

81.  On or about April 30, 2013, Defendants caused to be sent by mail from India to the Western District of Pennsylvania, two packages of drugs which were received.  The first package contained Methotrexate and Tadalafil, both of which had been manufactured in India.  The second package contained Capecitabine (active ingredient in Xeloda), which had been manufactured in India.

82.  None of these drugs had been approved by the FDA, were approved generics, or were imported into the United States by an approved importer or manufacturer.  Further, none of these drugs contained adequate directions for use.

83.  On or about May 20, 2013, the Defendants agreed to sell Zoloft, Elavil, and Sildenafil Citrate (all of which require a prescription to be dispensed) to an undercover agent

of the Food and Drug Administration. This purchase was made from the website www.superdrugsaver.com, which is operated by the Defendants. The purchase price totaled $210.95, and this purchase was completed over the Internet.

84. No prescription or medical necessity was required by the defendants to purchase these medications. Further, the FDA requires all antidepressants, including sertraline (Zoloft). to carry black box warnings regarding the increased risk of suicide that comes from taking sertraline. No such warnings were present either on the website or on the received drugs.

85. The transaction was completed as follows. The undercover agent paid for the drugs using a credit card for the amount of $210.95. After paying for the drugs, the agent received an email stating that the transaction would appear on the billing statement as "Walnu-cabinets PLC."

86. On or about May 20, 2013, Defendants caused to be sent by mail from India to the Western District of Pennsylvania, three packages of drugs which were received. The first package contained Sildenafil Citrate (active ingredient in Viagra), manufactured in India. The second package contained Sertraline Hydrochloride (active ingredient in Zoloft), manufactured in India. The third package contained Amitriptyline Hydrochloride (an antidepressant and the active ingredient in Elavil; no generics of Elavil had been approved by the FDA), manufactured

35

in India.

87.   None of these drugs had been approved by the FDA, were approved generics, or were imported into the United States by an approved importer or manufacturer.   Further, none of these drugs contained adequate directions for use.

88.   On or about August 2, 2013, the Defendants agreed to sell Sustiva, Abilify, Zofran and Tadalafil (all of which required a prescription to be dispensed) to an undercover agent of the Food and Drug Administration.   This purchase was made from the website www.emedoutlet.com, which is operated by the Defendants.   The purchase price totaled $419.96, and this purchase was completed over the Internet.

89.   No prescription or medical necessity was required by the defendants to purchase these drugs.

90.   The transaction was completed as follows.   After selecting the items mentioned above for purchase, the undercover agent paid with his Visa credit card.   The agent was then informed that this payment would appear on his credit card statement as "chancethe365 PTY LTD."

91.   On or about August 2, 2013, Defendants caused to be sent by mail from India to the Western District of Pennsylvania, three packages of drugs which were received.   The first package contained Ondansetron (active ingredient in Zofran), manufactured in India.   The second package contained

Aripiprazole (active ingredient in Abilify), manufactured in India. The third package contained Efavirenz (active ingredient of Sustiva), also manufactured in India.

92. None of these drugs had been approved by the FDA, were authorized generics, or were imported into the United States by an approved importer or manufacturer. Further, none of these drugs contained adequate directions for use.

## COUNT ONE

The Grand Jury charges:

93.   Paragraphs 1 through 92 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

### THE CONSPIRACY AND ITS OBJECTS

94.   Beginning as early as November, 2005, and continuing until at least in and around April, 2014, both dates being approximate and inclusive, in the Western District of Pennsylvania, and elsewhere, the defendants **JAVED SUNESRA, BISMILLA SUNESRA, TAIMUR KHAN, and ZUNED SUNESRA**, acting through their companies, Asian Capital Equities, Emedoutlet.com, SKI USA and Mygiftcard.biz, and others, both individuals and companies, known and unknown to the grand jury, and aided and abetted by one another, did knowingly and willfully combine, conspire, confederate and agree with others both known and unknown to the Grand Jury to commit offenses against the United States, that is:

a.   To defraud the United States and its agencies, specifically the Food and Drug Administration, by circumventing the drug distribution system established to protect American consumers by regulating the labels, labeling, distribution, and manufacture of prescription drugs shipped or received in interstate commerce in order to ensure the safety, quality, and

efficacy of drugs manufactured, sold, distributed, and dispensed in the United States; and,

b.   To commit an offense against the United States, that is, with intent to defraud and mislead, to introduce into interstate commerce misbranded drugs, specifically prescription drugs that did not bear adequate directions for use, in violation of Title 21, United States Code, Sections 331(a), 333(a)(2), 352(f), and 353(b)(1); and,

c.   To fraudulently and knowingly import and bring into the United States merchandise contrary to law, in violation of Title 18, United States Code, Section 545, specifically, misbranded drugs in violation of Title 21, United States Code, Section 331(a).

## GOAL OF THE CONSPIRACY

95.   It was a goal of the conspiracy to obtain money and other things of value by selling to United States customers unapproved and misbranded prescription drugs, including controlled substances, and to evade United States laws and regulations regarding the distribution, labeling and sale of prescription drugs.

## MANNER AND MEANS

96.   It was part of the conspiracy that the Defendants created, maintained, and associated with the website emedoutlet.com and its affiliated websites, which offered

misbranded and counterfeit drugs for sale.

97. It was further part of the conspiracy that the Defendants offered these misbranded and counterfeit drugs, which included prescription drugs such as Zoloft, Cialis, Viagra, Soma, and others, for importation and sale into the United States from India without a prescription by a licensed practitioner.

98. It was further part of the conspiracy that the Defendants accepted orders for prescription drugs via these websites and then shipped these misbranded drugs to residents within the United States from outside the United States.

99. It was further part of the conspiracy that the Defendants knew that what they were doing violated the laws of the United States.

100. It was further part of the conspiracy that the Defendants were paid by website customers, who ordered the misbranded and counterfeit drugs via credit card processors and bank transfers.  These remitted monies were then transferred from the United States to Canada and other countries.

## OVERT ACTS

101. In furtherance of said conspiracy and to effect and accomplish the objects thereof, the following overt acts, among others, were committed in India and within the Western District of Pennsylvania.  Each overt act is a shipment of misbranded

drugs sent by Defendants from a foreign country into the United States.

| OVERT ACT | APPROX. DATE | COUNTRY SENT FROM | DESTINATION | MISBRANDED DRUGS |
|---|---|---|---|---|
| 1 | Sep. 6, 2012 | India | W.D. Pennsylvania | Celecoxib, Carisoprodol |
| 2 | Sep. 29, 2012 | India | W.D. Pennsylvania | Salmetrol, Fluticasone, Sildenafil citrate |
| 3 | Nov. 30, 2012 | India | W.D. Pennsylvania | Duloxetine, Tadalafil |
| 4 | Jan. 30, 2013 | India | W.D. Pennsylvania | Carisoprodol, Amantadine Hydrochloride, Escitalopram Oxalate |
| 5 | Apr. 3, 2013 | India | W.D. Pennsylvania | Carisoprodol, Accutane Isotretinoin, Orlistat |
| 6 | Apr. 30, 2013 | India | W.D. Pennsylvania | Methotrexate, Tadalafil, Capecitabine |
| 7 | May 20, 2013 | India | W.D. Pennsylvania | Sildenafil Citrate, Sertraline Hydrochloride, Amitriptyline Hydrochloride |
| 8 | Aug. 2, 2013 | India | W.D. Pennsylvania | Ondansetron, Aripiprazole, Efavirenz. |

In violation of Title 18, United States Code, Section 371.

## COUNTS 2-9

The Grand Jury further charges:

102. Paragraphs 1 through 101 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

103. At all times relevant to this Superseding Indictment, the United States Food and Drug Administration (FDA) was the agency of the United States responsible for, among other things, enforcing the provisions of the Federal Food, Drug, and Cosmetic Act, Title 21, United States Code, Sections 301-397.

104. Elecoxib, Carisoprodol, Salmetrol, Fluticasone, Sildenafil Citrate, Duloxetine, Tadalafil, Amantadine Hydrochloride, Escitalopram Oxalate, Isotretinoin, Orlistat, Methotrexate, Tadalafil, Capecitabine, Sertraline Hydrochloride, Amitriptyline Hydrochloride, Ondansetron, Aripiprazole, and Efavirenz were drugs within the meaning of Title 21, United States Code, Section 321(g), and further were prescription drugs within the meaning of Title 21, United States Code, Section 353(b)(1)(A), in that due to their toxicity and other potentially harmful effects, these drugs were not safe for use except under the supervision of a practitioner licensed by law to administer the drug, and that these drugs, because of their application, had been approved by the FDA under Title 21, United

42

States Code, Section 355, for the limited use under the professional supervision of a properly licensed medical practitioner.

105. A drug is deemed to be misbranded unless its labeling contained adequate directions for use, which was defined by regulation as directions under which a layman can use a drug safely and for the purposes for which it was intended. Title 21, United States Code, Section 352(f); 21 C.F.R. § 201.5.

106. Prescription drugs were exempt from the adequate directions for use requirement provided that they were properly dispensed under the supervision of a properly licensed medical practitioner. Title 21, United States Code, Section 353(b)(2).

107. Prescription drugs that have been dispensed without the supervision of a properly licensed medical practitioner have been misbranded within the meaning of Title 21, United States Code, Section 352(f).

108. The act of dispensing prescription drugs without the prescription of a practitioner licensed by law to administer such drug was an act which caused the drug to become misbranded while held for sale. Title 21, United States Code, Section 353(b)(1).

109. On or about the dates set forth below, in the Western District of Pennsylvania, and elsewhere, the defendants, **JAVED SUNESRA, BISMILLA SUNESRA, and JAVED SUNESRA,** aided and abetted

43

by one another, and by others known and unknown to the Grand Jury did, with intent to defraud and mislead the Food and Drug Administration, did introduce and cause to be introduced into interstate commerce prescription drugs, as set forth above in paragraph 103, that were misbranded, that is,

a.   Drugs without adequate directions for their use as required by Title 21, United States Code, Section 352(f)(1);

b.   Drugs manufactured and imported by establishments not registered with the FDA as required by Title 21, United States Code, Section 352(o); and,

c.   Drugs dispensed without the prescription of a practitioner licensed by law to administer the drug as required by Title 21, United States Code, Section 353(b)(1).

110. By mailing drugs into the United States from the countries listed below to the destinations listed below that were delivered or intended to be delivered by the United States Postal Service, the Defendants imported and distributed misbranded drugs into the United States.

| COUNT | ON OR ABOUT DATE | COUNTRY SENT FROM | DESTINATION | MISBRANDED DRUGS |
|---|---|---|---|---|
| 2 | Sep. 6, 2012 | India | W.D. Pennsylvania | Elecoxib, Carisoprodol |
| 3 | Sep. 29, 2012 | India | W.D. Pennsylvania | Salmetrol, Fluticasone, Sildenafil citrate |
| 4 | Nov. 30, 2012 | India | W.D. Pennsylvania | Duloxetine, Tadalafil |
| 5 | Jan. 30, 2013 | India | W.D. Pennsylvania | Carisoprodol, Amantadine Hydrochloride, Escitalopram Oxalate |
| 6 | Apr. 3, 2013 | India | W.D. Pennsylvania | Carisoprodol, Isotretinoin, Orlistat |
| 7 | Apr. 30, 2013 | India | W.D. Pennsylvania | Methotrexate, Tadalafil, Capecitabine |
| 8 | May 20, 2013 | India | W.D. Pennsylvania | Sildenafil Citrate, Sertraline Hydrochloride, Amitriptyline Hydrochloride |
| 9 | Aug. 2, 2013 | India | W.D. Pennsylvania | Ondansetron, Aripiprazole, Efavirenz. |

In violation of Title 21, United States Code, Sections 331(a) and 333(a)(2), and Title 18, United States Code, Section 2.

## COUNT 10

The Grand Jury further charges:

111. Paragraphs 1 through 110 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth here.

A. Overview

112. From at least in and around 2005, to in and around April, 2014, in the Western District of Pennsylvania and elsewhere, the defendants, **JAVED SUNESRA, BISMILLA SUNESRA, ZUNED SUNESRA,** and **TAIMUR KHAN,** did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a. To commit mail fraud, that is to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and for the purpose of executing such scheme and artifice, to knowingly cause to be delivered certain mail matter by the United States Postal Service and by private and commercial

46

interstate carrier, according to the directions thereon, in violation of Title 18, United States Code, Section 1341;

b.   To commit wire fraud, that is to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and for the purpose of executing such scheme and artifice, to knowingly cause to be transmitted wire communications in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1343.

B. Purpose

113. It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by selling prescription and other drugs to individuals in the United States, falsely representing that the emedoutlet.com network of pharmacies was selling safe prescription drugs in compliance with the rules and regulatory authorities in the United States, when in fact, the defendants and their co-conspirators obtained the prescription drugs from various factories in India without properly ensuring the safety or authenticity of the drugs, and the prescription drugs were not sold to individuals in United States in accordance with the rules of regulatory authorities in the United States.

114. The Defendants accomplished this purpose through the use of both wire and mail fraud.

C. Manner and Means of the Conspiracy

115. Defendants, and others, operated the emedoutlet.com network of pharmacies as internet-based pharmacies located in India;

116. Defendants, and others, caused the marketing, sale and mailing of misbranded prescription drugs (both controlled substances and non-controlled substances) to residents of the United States from India;

117. Defendants, and others, made false and misleading statements on emedoutlet.com and its affiliates websites to induce individuals to purchase prescription drugs from emedoutlet.com and its affiliates.

118. From in and around September 18, 2012, to in and around May, 2014, emedoutlet.com's websites falsely stated that:

a. Emedoutlet.com and its affiliates were selling prescription drugs approved by the FDA for sale in the United States, when in fact, and as the Defendants well knew, many of the drugs emedoutlet.com had caused to be mailed to customers in the United States violated FDA regulations because they were counterfeit, misbranded and not FDA approved;

b. Emedoutlet.com and its affiliates were selling generic drugs that had been produced in facilities "designed and

48

maintained as per FDA and WHO specifications," when in fact, this was not true;

c.   Emedoutlet.com and its affiliates were carrying the "same compatible brand name in generic strength prescription products you would find in your neighborhood pharmacy," when in fact, the laboratory tests on the medications shipped have confirmed that these medications were not comparable to medicines produced in the United States;

d.   Emedoutlet.com and its affiliates were shipping medicines made by manufacturers, to include, Pfizer, Sanofi, Aventis, and Merck, when in fact, these manufacturers were not providing medications to emedoutlet.com and emedoutlet.com was not shipping medicines made by these manufacturers;

e.   Emedoutlet.com and its affiliates required a prescription in order to ship prescription medications to customers, when in fact, no prescription was required.

119. In addition, Defendants created the website mygiftcard.biz, which was, as set forth above, a website created to fraudulently misrepresent to payment processors the true nature of the emedoutlet.com business.   Specifically, mygiftcard.biz was created to provide a means for customers to pay for medications by credit or debit card while making it appear to credit card payment processors that the items being purchased were not medications, but were instead "gift cards."

120. All of these misrepresentations on the websites and the various promotional materials of emedoutlet.com constituted wire fraud as they were designed to mislead United States consumers into purchasing these misbranded medications. Further, placing these medications into interstate commerce by shipping via both public and private mail carriers to the United States constituted mail fraud as these medications were not the medications consumers believed that they were purchasing. Finally, by creating and utilizing mygiftcard.biz, emedoutlet.com defrauded the payment processors.

D. Overt Acts

121. The following shipments of prescription medications from India to the United States constitute overt acts committed in furtherance of the mail fraud conspiracy.

| On or about date of mailing | Description of Item Mailed |
|---|---|
| November 27, 2012 | Shipment via EMS from Mumbai, India, to Sean Flair in Cranberry Township, Pennsylvania, USA assigned tracking number 1-RM176560612IN, containing three foil packs of generic Cialis. |
| November 27, 2012 | Shipment via EMS from Mumbai, India, to Sean Flair in Cranberry Township, Pennsylvania, USA assigned tracking number 2-RM176560691IN, containing generic duloxetine |
| January 28, 2013 | Shipment via EMS from Mumbai, India to Jason Smith in Cranberry Township, Pennsylvania, USA assigned tracking number RM049842165IN, containing generic carisoprodol |
| January 28, 2013 | Shipment via EMS from Mumbai, India to Jason Smith in Cranberry Township, Pennsylvania, USA assigned tracking number RM049849897IN, containing generic amantadine hydrochloride |

| | and escitalopram |
|---|---|
| April 30, 2013 | Shipment via EMS from Mumbai, India to Sean Flair in Cranberry Township, Pennsylvania, USA assigned tracking number RM187598429IN, containing generic methotrexate |
| April 30, 2013 | Shipment via EMS from Mumbai, India to Sean Flair in Cranberry Township, Pennsylvania, USA assigned tracking number RM187598429IN, containing generic tadalafil |
| April 30, 2013 | Shipment via EMS from Mumbai, India to Sean Flair in Cranberry Township, Pennsylvania, USA assigned tracking number RM187598414IN, containing generic capecitabine |

122. The following wire communications constitute overt acts committed in furtherance of the wire fraud conspiracy.

| Approximate date | Wire Communication |
|---|---|
| April 30, 2013 | Email from westcoastdrugs.net to "Sean Flair," located in the Western District of Pennsylvania, which provided a link to allow Flair to utilize his credit card to pay for a gift card at mygiftcard.biz |
| February 11, 2013 | Email from Taimur Khan to Elavon, in which Khan distanced mygiftcard.biz from emedoutlet.com and its affiliates, claiming that they were separate businesses that had nothing to do with each other |
| February 1, 2013 | Call between Elavon and Taimur Khan, in which Khan falsely represented to Elavon that he sold only "gift cards". |
| January 14, 2013 | Email from westcoastdrugs.net to "Jason Smith," located in the Western District of Pennsylvania, which provided a link to allow Smith to utilize his credit card to pay for a gift card at mygiftcard.biz |
| September 18, 2012 | Shopeastwest.com website, which stated to customers that emedoutlet.com shipped "genuine products and supplies," and that these medicines would have the "same effectiveness" as medicines purchased at a "local pharmacy." |

In violation of Title 18, United States Code, Section 1349.

## COUNT 11

The Grand Jury further charges:

123. Paragraphs 1 through 122 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

124. From in and around September, 2012, and continuing thereafter to in and around April, 2013, in the Western District of Pennsylvania, in the customs territory of the United States, and elsewhere, the defendants, **JAVEED SUNESRA, ZUNED SUNESRA,** and **BISMILLA SUNESRA,** and others known and unknown to the grand jury, did knowingly and intentionally combine, conspire, confederate and agree with others both known and unknown, to import into the customs territory of the United States from India, Schedule IV non-narcotic controlled substances in violation of Title 21, United States Code, sections 952(b), 960(a)(1) and (b)(6).

125. It was a goal of the conspiracy to obtain money and other things of value by distributing controlled substances to customers in the United States and elsewhere.

In violation of Title 21, United States Code, Section 963.

## COUNTS 12-14

The Grand Jury further charges:

126. Paragraphs 1 through 125 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

127. On or about the dates listed below, and from the countries listed below, the defendants **JAVEED SUNESRA, ZUNED SUNESRA,** and **BISMILLA SUNESRA,** aided and abetted by another, did knowingly and intentionally import and cause to be imported into the customs territory of the United States as set forth below, Schedule IV non-narcotic controlled substances containing detectable amounts of the controlled substances set forth below.

| COUNT | DATE (RECEIVED) & COUNTRY SENT FROM | DESTINATION | DRUG | CONTROLLED SUBSTANCE SCHEDULE |
|---|---|---|---|---|
| 12 | Sep. 20, 2012 (India) | Pennsylvania | Carisoprodol | IV |
| 13 | Feb. 15, 2013 (India) | Pennsylvania | Carisoprodol | IV |
| 14 | Apr. 12, 2013 (India) | Pennsylvania | Carisoprodol | IV |

In violation of Title 21, United States Code, Sections 952(b), 960(a)(1) and 960(b)(6), and Title 18, United States Code, Section 2.

## COUNTS 15 to 17

The Grand Jury further charges:

128. Paragraphs 1 through 127 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

129. On or about the dates listed below, from the countries listed below, the defendants, **JAVEED SUNESRA, ZUNED SUNESRA**, and **BISMILLA SUNESRA,** aided and abetted by one another, did knowingly and intentionally distribute quantities of drugs containing detectable amounts of controlled substances as set forth below.

| COUNT | DATE (RECEIVED) & COUNTRY SENT FROM | DESTINATION | DRUG | CONTROLLED SUBSTANCE SCHEDULE |
|---|---|---|---|---|
| 15 | Sep. 20, 2012 (India) | Pennsylvania | Carisoprodol | IV |
| 16 | Feb. 15, 2013 (India) | Pennsylvania | Carisoprodol | IV |
| 17 | Apr. 12, 2013 (India) | Pennsylvania | Carisoprodol | IV |

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(2), and Title 18, United States Code, Section 2.

## COUNT 18

The Grand Jury further charges:

A. Overview

130. Paragraphs 1 through 129 of this Superseding Indictment are re-alleged and incorporated as if fully set forth herein.

131. From at least in and around April, 2012, and continuing thereafter to in and around September, 2013, in the Western District of Pennsylvania and elsewhere, the defendants, **JAVED SUNESRA, ZUNED SUNESRA, and TAIMUR KHAN,,** did knowingly, intentionally and unlawfully conspire together with one another, and with persons both known and unknown to the grand jury, to launder monetary instruments in violation of Title 18, United States Code, Section 1956(a)(2)(A).

132. It was a part and object of the conspiracy that the defendants, **JAVED SUNESRA, ZUNED SUNESRA,** and **TAIMUR KHAN,** the defendants, and others known and unknown, would and did transport, transmit, and transfer and attempt to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, smuggling, narcotics distribution, mail fraud, and wire fraud, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

55

B. Manner and Means of the Conspiracy

133. In furtherance of the conspiracy and to effect the illegal objectives therefore, the defendants, **JAVED SUNESRA**, **ZUNED SUNESRA**, and **TAIMUR KHAN,** and others known and unknown, committed the following acts, amongst numerous other acts, in the Western District of Pennsylvania and elsewhere:

134. Directed and arranged Paypal payments from emedoutlet.com customers (all of whom purchased illegally imported prescription drugs), located in the United States in the Western District of Pennsylvania, to a Paypal account controlled by the defendant **TAIMUR KHAN.**

| DATE | AMOUNT (USD) | RECIPIENT |
| --- | --- | --- |
| 11/13/2012 | 43.39 | admin@mygiftcard.biz |
| 11/27/2012 | 167.66 | admin@mygiftcard.biz |
| 12/8/2012 | 70.08 | admin@mygiftcard.biz |
| 1/28/2013 | 137.55 | admin@mygiftcard.biz |
| 2/14/2013 | 43.39 | admin@mygiftcard.biz |
| 2/25/2013 | 183.20 | admin@mygiftcard.biz |
| 3/12/2013 | 131.19 | admin@mygiftcard.biz |
| 4/6/2013 | 20.08 | admin@mygiftcard.biz |
| 4/20/2013 | 75.42 | admin@mygiftcard.biz |
| 4/30/2013 | 315.25 | admin@mygiftcard.biz |
| 5/6/2013 | 86.10 | admin@mygiftcard.biz |

135. Paypal maintains data servers in San Jose, California, Santa Clara, California, Phoenix, Arizona, Denver, Colorado, and South Jordan, Utah, and processes credit card transactions through a bank located in Minneapolis, Minnesota.

136. Directed and arranged withdrawals from Paypal account admin@mygiftcard.biz to a Canadian account controlled by Defendant Taimur Khan that was located at the Royal Bank of Canada:

| DATE | AMOUNT (USD) | RECIPIENT BANK ACCOUNT |
|------|--------------|------------------------|
| 08/24/2012 | 2,000 | xxxx6497 |
| 8/28/2012 | 1,975 | xxxx6497 |
| 10/14/2012 | 2,500 | xxxx6497 |
| 11/22/2012 | 2,800 | xxxx6497 |
| 12/20/2012 | 2,500 | xxxx6497 |
| 01/09/2013 | 2,500 | xxxx1863 |
| 01/28/2013 | 7,500 | xxxx1863 |
| 02/21/2013 | 3,500 | xxxx1863 |
| 04/06/2013 | 7,000 | xxxx1863 |
| 05/07/2013 | 6,000 | xxxx1863 |
| 05/22/2013 | 6,500 | xxxx1863 |
| 05/30/2013 | 5,500 | xxxx1863 |

137. Directed and arranged wire transfers from accounts xxxx6497 and xxxx1863 at the Royal Bank of Canada to an account

in the name of Asian Capital Equities, as controlled by **ZUNED SUNESRA** and **JAVED SUNESRA**, located at the State Bank of Mauritius, in the Republic of Mauritius:

| DATE | AMOUNT (USD) | Payee |
|------|--------------|-------|
| 09/06/2012 | 3,964.70 | Asian Capital Equities |
| 09/06/2012 | 5,195.91 | Asian Capital Equities |
| 09/28/2012 | 10,083.73 | Asian Capital Equities |
| 09/28/2012 | 4,220.06 | Asian Capital Equities |
| 10/30/2012 | 11,083.00 | Asian Capital Equities |
| 10/30/2012 | 2,937.00 | Asian Capital Equities |
| 11/28/2012 | 11,083.00 | Asian Capital Equities |
| 11/28/2012 | 2,937.00 | Asian Capital Equities |
| 12/28/2012 | 13,447.13 | Asian Capital Equities |
| 07/22/2013 | 17,008.94 | Asian Capital Equities |
| 08/6/2013 | 6,229.11 | Asian Capital Equities |
| 08/6/2013 | 16,346.99 | Asian Capital Equities |

In violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS

138. Upon conviction of the offenses alleged in Counts 12 through 17 of this Superseding Indictment, the government will seek forfeiture of any property constituting, or derived from, any proceeds defendants obtained, directly or indirectly, from said offenses, and any of the defendant's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of said offenses, pursuant to Title 21, United States Code, Section 853. The government also will seek a money judgment for a sum of money equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses alleged in Counts 12 through 17 of this Superseding Indictment.

139. Upon conviction of the offenses alleged in Counts 1 through 9 of this Superseding Indictment, the government will seek forfeiture of any equipment or thing used in, or to facilitate, these offenses, pursuant to Title 21, United States Code, Section 334.

140. Upon conviction of the offenses alleged in Counts 10 and 18 of this Superseding Indictment, the government will seek forfeiture of any property, real or personal, involved in these offenses, and any property traceable to such property, pursuant to Title 18, United States Code, Sections 982(a)(1), 982(a)(2), 982(a)(3), and 982(a)(8). The government also will seek a money

judgment for a sum of money equal to the value of the property, real or personal, involved in the offenses alleged in Counts 10 and 18, and any property traceable to such property.

141. If any of the property described above in paragraphs 137 through 139 as being subject to forfeiture, as a result of any act or omission of any of the four defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendants up to the value of said property listed above as being subject to forfeiture.

A True Bill,

_____
Foreperson

_____
DAVID J. HICKTON
United States Attorney
PA ID No. 34524

60